**Boyd GUDGEL and Geraldine Gudgel, Petitioners,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 13778.**

United States Court of Appeals Sixth Circuit.

Dec. 28, 1959.

Richard C. Oldham, Louisville, Ky. (Clinton R. Burroughs, Louisville, Ky., on the brief), for petitioners.

Helen Buckley, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, Robert N. Anderson, Karl Schmeidler, Atty., Dept. of Justice, Washington, D. C., on the brief), for respondent.

Before McALLISTER, Chief Judge, and SIMONS and WEICK, Circuit Judges.

SIMONS, Circuit Judge.

The petitioners, husband and wife, were dairy farmers. The principal issue in the case is whether, in subdividing their farm and selling lots therein, during the tax years 1951, 1952, and 1953, at a profit, they should have been permitted to return such profit in their income tax returns as capital gains or whether they were required to return it as ordinary income. The Commissioner asserts the profits constituted ordinary income and the Tax Court so held. The petitioners challenge that determination.

There is no dispute about the evidentiary facts. Most of them were stipulated and others brought forth upon oral examination of Gudgel, not controverted by conflicting evidence, attacked upon cross-examination, or by destructive analysis. The Tax Court rested its determination upon an ultimate fact inferred from the evidentiary facts found by it.

Since the Commissioner and the Court placed great reliance upon the chronological sequence of events, it becomes necessary to recite them in detail.

In 1940, long prior to the tax years, the petitioners acquired 17½ acres of land in Jefferson County, Kentucky, on which they built a house, barn and silo, and proceeded to operate thereon a dairy farm. The acreage not so used was devoted to pasture. In 1943, they acquired 19½ additional adjoining acres, which they fenced in 1944 for pasture and hay. Later in that year, the State of Kentucky extended Ralph Avenue through their

property, dividing it approximately into halves. In 1945, the petitioners purchased an additional 14.7 acres, adjoining the land previously acquired, and leased other adjoining land for grazing and hay production. In 1948, or 1949, the petitioners received an offer from someone by the name of Fey who wished to construct a house upon part of their land and, at his solicitation, sold him five lots abutting on the south side of Ralph Avenue, as extended. Later in 1949, petitioners placed an advertisement in a Louisville newspaper, offering lots for sale and about a dozen crude signs were put upon the fence line bearing the inscription "Lots". Still later, they sold three additional lots abutting on the south side of Ralph Avenue. In 1950, the petitioners sold five lots abutting on the north side of Ralph Avenue and one additional lot abutting on the south side of Ralph Avenue. In that same year, they opened up Likens Avenue into the remaining portion of their land south of Ralph Avenue, dedicating the roadway to public use, after having the abutting land surveyed and subdivided into residential building lots. Two of these lots were sold in 1950. In that year, they acquired a tract of land located 1200 feet from the subdivided property, on which they constructed a small shopping center.

In 1951, the first tax year, the petitioners sold thirteen lots on Likens Avenue and one on the north side of Ralph Avenue. In 1952, they opened Gudgel Road into that part of the property north of Ralph Avenue, dedicated it to public use and had the abutting land surveyed and subdivided into residential building lots. That year, they sold one tract abutting on the south side of Ralph Avenue and ten lots abutting on Gudgel Road. In 1952, the second tax year, the Illinois Central Railway Company approached the petitioners with an offer to purchase 5.72 acres of land for use as a right-of-way across the farm. Gudgel testified, without contradiction, that the Railroad wanted to buy just enough to lay the track which would require about a third of an acre. He insisted that they buy the whole tract but after some talk about putting a viaduct underneath the railroad, so he could get to the west side of his farm, the Railroad said it would be impossible, but "if I would stake off the land west of there—west of the railroad —they would take the remaining property that I had left over to correspond with my property plan." The petitioners then sold the Railroad the 5.72 acres of land. Since the railroad ran at right angles to Ralph Avenue, it divided the farm into four irregular sections.

When, in 1944, Ralph Avenue was continued to accommodate the traffic from Rubber Town, it wasn't, at first, too big a problem crossing the road. When they started running three and four shifts, working twenty-four hours a day, the traffic was terrific. It would take three or four men to move the cattle and "the people just had no respect whatever for my livestock." It was then that the petitioners started to dispose of their farm. Asked what effect the sale to the railroad had, the response was, "Well, it just put me out of business." In the three tax years, a total of forty eight lots were sold. While they opened the roads for access by the purchasers, they made the very minimum of improvements. They installed no water lines and the purchasers dug their own individual wells. After the vendees started to build, they themselves arranged for connection with the electric light company. The area was zoned for heavy industry and factories moved into the neighborhood. The lot owners began fighting the smoke from Rubber Town. In selling to prospective homeowners, the petitioners took what they could get as a down payment, with instalments sometimes of $20.00 per month. Neither Gudgel nor his wife had ever been in the real estate business, they had no real estate license, they bought no land prior to 1941, and bought none subsequent to the tax years. Their reason for letting a real estate man sell some of the lots was that he owed them money and the lots were to be sold on the understanding that the commissions would be applied upon his indebtedness. They had

sold the real estate agent four lots upon which the agent built houses, just to get rid of them because the land was getting stale and was going "sour". Gudgel placed one advertisement of "Lots For Sale" in a newspaper and the crude signs placed on the fence line had the single designation, "Lots".

Section 117(a) of the Internal Revenue Code of 1939, 26 U.S.C. § 117(a), defines "capital assets" as property held by the taxpayer (whether or not connected with his trade or business), but does not include the taxpayer's stock in trade or other property of a kind which would properly be included in the inventory of the taxpayer, if on hand at the close of the taxable year, or "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business."

The principal issue is whether, during the tax years 1951, 1952 and 1953, the Gudgel farm land had been held by the petitioners primarily for sale to customers, in the ordinary course of trade or business. Gudgel's attack upon the Tax Court's decision rests primarily on his assertion that he was forced to liquidate his farm and his activities were directed only to that end. The Government urges that this contention is a factual rather than a legal attack upon the Court's finding, resting upon three asserted premises: 1) That the area around the farm was zoned for heavy industry, 2) that the State in 1944 extended Ralph Avenue across the farm, and 3) that the Illinois Central Railroad in 1952 continued its right-of-way across the farm so as to divide it into quarters and that these three events made it impossible for Gudgel to continue the operation of his dairy farm.

The Tax Court reasoned that no one of these factors had any material bearing upon Gudgel's asserted desire to liquidate the farm. It is, however, common experience that where the character of a neighborhood undergoes substantial change, it is usually the result not of an isolated circumstance but derives from cumulative changes that affect the de-

sirability of land for the purpose for which it was originally purchased. Gudgel's complaint is not primarily the extension of Ralph Avenue but from the greatly increased use of it due to the zoning of the area for factory purposes, which made it difficult for him to move his stock and, so, made uneconomical the carrying on of his farm activities. The building of a railroad track across his farm was the climax of his troubles in operating the farm. The totality of interference with his dairy activities provides an eminently reasonable ground for finally concluding that he could not economically operate his farm as a dairy, and called for its liquidation.

The Tax Court's ultimate finding that Gudgel was engaged in the real estate business during the tax years is based primarily upon the undisputed fact that Gudgel sold during the tax years forty eight lots, opened streets to furnish access to purchasers, and reaped a profit of more than $51,000 on farm land he purchased between 1940 and 1945, and began subdividing it by an isolated sale in 1948 or 1949.

This brings us to a consideration of the scope of our power of review in tax litigation. By Title 26 U.S.C. § 7482, the United States Courts of Appeals were given exclusive jurisdiction to review dicisions of the Tax Court " * * * in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury". This is substantially an application of the old equity rule and is the subject matter of Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C., which recites that "findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses". There has been a difference of opinion as to whether the reason for the rule conditions its application. The courts have almost invariably, in applying the rule, cited the reason for its existence, and absent the reason; that is, where there is conflicting evidence, it requires a judgment as to the

good faith, truthfulness and candor of witnesses. It is felt, however, in many cases, that the Court of Appeals is as well qualified as the District Judge, or the Tax Court, to draw inferences and conclusions from undisputed facts without subjecting them to the test of the "clearly erroneous" rule.

■ These differing views have found their way even in our own circuit. Compare Yunker v. Commissioner, 6 Cir., 256 F.2d 130 with Commissioner v. Consolidated Premium Iron Ores, Limited, 6 Cir., 265 F.2d 320. We think the Yunker case states the better rule and is sufficiently supported by persuasive precedent. In Gamble v. Commissioner, 5 Cir., 242 F.2d 586, 590, it was said: "The question as to whether property was held by the taxpayer primarily for sale in the ordinary course of business is principally a fact question, * * *. but where the credibility of witnesses is not involved this Court may be in as good a position as was the Tax Court; and in so far as the so-called 'ultimate fact' is simply reached by processes of legal reasoning from, or the legal significance of, the evidentiary facts, it is subject to review free from the restraining impact of the so-called 'clearly erroneous' rule." In Yunker v. Commissioner, supra, we held that when the evidentiary facts are not in dispute the reviewing Court is not bound by findings of ultimate fact below.

We have examined many cases and have listed in the margin [1] illustrative cases on both sides of the question.

■■ If we are right in our appraisal of the scope of review, where there are no disputed evidentiary facts, it becomes necessary to determine whether the lots sold during the tax years by the petitioners constituted property held by the taxpayers primarily for sale to customers in the ordinary course of the petitioners' trade or business; in other words, whether they had put themselves in the category of real estate dealers by the nature and extent of their transactions. The response of the taxpayers is that it became uneconomical to use the farm as a dairy and that they had embarked upon an orderly course of liquidation of their farm property. It was pointed out in Consolidated Naval Stores Co. v. Fahs, 5 Cir., 227 F.2d 923, 926, that there are usually factors casting weight upon each side of the question and in many instances the issue becomes a close one and no single fact will be decisive in the usual case. The Tenth Circuit, and perhaps others, have undertaken a catalogue of the circumstances to be considered, which included the purpose for which property was acquired, the activity of the taxpayer and his agents with respect thereto, the making of improvements to the property, conducting a sales campaign, the frequency and continuity of sales, as well as other factors reasonably tending to show that the transactions were in furtherance of liquidation or in the course of the taxpayers' occupation or business. We see no occasion to enlarge upon this catalogue. The purpose of the petitioners in acquiring the land for a dairy farm is not in dispute. It was conceded in argument that if they had sold the farm as a single unit their profits must have been classed as capital gains. Their first sale was at the solicitation of the purchaser. It clearly did not put the taxpayers into the real estate business. Five years were to elapse without fur-

1. Cases holding findings of ultimate fact are subject to the "clearly erroneous" rule when the facts are undisputed include: Central Ry. Signal Co. v. Longden, 7 Cir., 1952, 194 F.2d 310; Coleman v. Sears, Roebuck & Co., 8 Cir., 1952, 238 F.2d 206; Hycon Manufacturing Co. v. H. Koch & Sons, 9 Cir., 1955, 219 F.2d 353, certiorari denied 349 U.S. 953, 75 S.Ct. 881, 99 L.Ed. 1278; Kaye v. Smitherman, 10 Cir., 1955, 225 F.2d 583, certiorari denied 350 U.S. 913, 76 S.Ct. 197, 100 L.Ed. 800.

Cases holding appellate court may disregard ultimate findings when based on undisputed evidence include: Kraft Foods Co. v. Commissioner, 2 Cir., 1956, 232 F.2d 118; United States v. One 1950 Buick Sedan, 3 Cir., 1956, 231 F.2d 219; Sheldon & Co. v. Commissioner, 6 Cir., 1954, 214 F.2d 655; Stevenot v. Norberg, 9 Cir., 1954, 210 F.2d 615.

ther transactions, clearly indicating the desire to use the property as a farm. When they did subdivide and began the sale of lots, their purpose was similar to that of the taxpayer in Barrios' Estate v. Commissioner, 5 Cir., 265 F.2d 517, who found his 165 acres unsuitable for farming and thereupon proceeded to subdivide and sell residential lots. The decision was that the taxpayers' purpose was to liquidate a capital asset. The minimum improvements that the taxpayers put upon the property, in providing access to the purchasers of lots, was merely an attempt to dispose of their holdings advantageously in an orderly, business-like manner. Riedel v. Commissioner, 5 Cir., 261 F.2d 371; Home Co. v. Commissioner, 10 Cir., 212 F.2d 637, 639; Yunker v. Commissioner, supra. The respondent draws the distinction between the instant case and Yunker because Yunker attempted to sell the entire tract and was reluctant to subdivide. It is not a valid distinction, in the light of Barrios' Estate v. Commissioner, supra; Smith v. Dunn, 5 Cir., 224 F.2d 353; Camp v. Murray, 4 Cir., 226 F.2d 931. The point made by the respondent that the non-farm income greatly exceeded their farm income during the tax years would seem to emphasize the fact that their activities in dairying subjected them to disturbing interruptions by the changing character of the area. It is not, therefore, a controlling factor. It must be noted that they acquired no additional land for the purpose of subdividing. Their purchase of the site for a shopping center near the farm is as consonant with the purpose of liquidation as it would be to entering upon a real estate business and there is no evidence that the market site was sold or offered for sale. The sale of forty eight lots over a period of three years did not put the petitioners in the real estate business, in view of the cases that have permitted capital gains treatment. Berberovich v. Menninger, D.C.E.D.Mich., 147 F.Supp. 890; Barrios' Estate v. Commissioner, supra; Smith v. Dunn, supra; Camp v. Murray, supra. Dillon v. Commissioner, 8 Cir.,

213 F.2d 218, involved twenty sales in one year and Smith v. Dunn dealt with the sale of fifty one lots in two years. Indeed, the Court's finding of facts concedes that the total number of sales involved may be comparatively small but that alone is not conclusive. Taking it all in all, we conclude that the Court was in error in assuming that these dairy farmers, by their activities, had placed themselves in the real estate business during the tax years.

A second issue presented to and ruled by the Tax Court related to the imposition of a double penalty under Sec. 294 (d) I.R.C., 26 U.S.C. § 294(d). We decided that case against the Commissioner in Acker v. Commissioner, 6 Cir., 258 F.2d 568. Our ruling was affirmed by the Supreme Court in Commissioner of Internal Revenue v. Acker, 80 S.Ct. 144 and the issue is no longer here for determination.

Reversed and remanded to the Tax Court with instructions to permit the profits on the sale of the land herein involved to be given the status of capital gains.