**ATLANTIC DISCOUNT COMPANY,
INC., Plaintiff-Appellee-
Cross Appellant,**

v.

**UNITED STATES of America,
Defendant-Appellant-Cross
Appellee.**

No. 72–2289.

United States Court of Appeals,
Fifth Circuit.

Jan. 30, 1973.

John L. Briggs, U. S. Atty., Jacksonville, Fla., Scott P. Crampton, Asst. Atty. Gen., Gilbert E. Andrews, Meyer Rothwacks, Donald H. Olson, Attys., Tax Division, U. S. Dept. of Justice, Washington, D. C., for appellant.

William R. Frazier, Fred M. Ringel, Jacksonville, Fla., for appellee.

Before GOLDBERG, AINSWORTH and INGRAHAM, Circuit Judges.

AINSWORTH, Circuit Judge:

Atlantic Discount, Inc. is engaged in the business of financing both retail and wholesale purchasers of automobiles and other consumer goods. In anticipation

of a certain percentage of loans being uncollectible, Atlantic established a reserve for bad debts. At issue in this case is the reasonableness of Atlantic's additions to the reserve for the years 1963 and 1964, which were deducted for tax purposes under section 166(c) of the Internal Revenue Code of 1954, 26 U.S.C. § 166(c) (1971).

Taxpayer justified the additions by resorting *inter alia* to general industry and banking standards. The Commissioner of Internal Revenue Service, in exercise of statutory discretion to review the reasonableness of additions to the reserve, concluded, however, that the additions were excessive. After recomputing the need for additions by examining taxpayer's prior loss experience, the Commissioner disallowed some of the claimed deductions and assessed a deficiency. Taxpayer paid the deficiency and filed this claim for refund. The District Judge, 339 F.Supp. 577, granted judgment for a refund by finding taxpayer's additions to the bad debts reserve to be reasonable and that the Commissioner had abused his discretion. We reverse and remand.

Atlantic reports its income on the accrual basis, so it accrues interest income ratably during the time a debt is outstanding rather than on the cash basis of reporting income as payment is received. To deduct bad debts related to earning this income, Atlantic could wait until the year a debt becomes worthless, as provided in section 166(a)(1): "There shall be allowed as a deduction any debt which becomes worthless within the taxable year." But to provide the taxpayer with a device for accelerating the deduction, Congress added section 166(c): "In lieu of any deduction under subsection (a), there shall be allowed (in the dis-

cretion of the Secretary or his delegate) a deduction for a reasonable addition to a reserve for bad debts." *See generally* 5 J. Mertens, The Law of Federal Income Taxation § 30.69 (1969); 3 J. Rabkin & M. Johnson, Federal Income, Gift and Estate Taxation § 35.05 (1972). The statute's only standard is that each addition to the reserve be "reasonable."

In the 1940 case of Black Motor Co., 41 B.T.A. 300 (1940), aff'd 6 Cir., 1942, 125 F.2d 977, the Board of Tax Appeals sanctioned what came to be known as the *Black Motor* formula of computing the deduction for each tax year, as follows: (1) Compute an average percentage based on bad debts for the current and five preceding tax years divided by the accounts and notes receivable outstanding; (2) multiply the percentage by the receivables outstanding at the end of the current tax year, thereby giving the "loss reserve"; (3) add the charges to the reserve during the current tax year, thereby giving the "total reserve requirement"; and (4) subtract the balance in the reserve at the end of the preceding tax year. The resulting amount is the deductible addition to the bad debt reserve. *See generally* Whitman, Gilbert, and Picotte, The Black Motor Bad Debt Formula: Why It Doesn't Work and How to Adjust it, 35 J.Tax. 366 (1971).

Instead of computing the percentage as outlined in step one of the formula, Atlantic consistently for a number of years used the percentage of 2.5 despite loss experience dating back to 1951 which showed only one year where the losses reached this figure.[1] Taxpayer in step two applied the percentage against outstanding gross retail receivables, thus excluding wholesale receivables. For the two years of 1963 and 1964, taxpay-

---

1. The loss percentage for the years 1951 through 1964 may be summarized as follows:

| Year | Losses as a percentage of net retail receivables |
|------|--------------------------------------------------|
| 1951 | .90 per cent |
| 1952 | 1.55 |
| 1953 | 2.38 |
| 1954 | 1.77 |
| 1955 | 2.33 |
| 1956 | 1.62 |
| 1957 | 1.88 |
| 1958 | 2.19 |
| 1959 | 2.22 |
| 1960 | 4.75 |
| 1961 | 2.42 |
| 1962 | .46 |
| 1963 | 1.03 |
| 1964 | 1.36 |

er's steps may be summarized in producing deductions of $132,999.90 and $192,547.01:

| | 1963 | 1964 |
|---|---|---|
| Step 1—percentage | 2.5 | 2.5 |
| Step 2—times receivables | | |
| 1963: 12,926,794 | | |
| 1964: 13,940,015 | 323,169.86 | 348,500.38 |
| Step 3—add charges | | |
| 1963: 116,987.52 | | |
| 1964: 167,216.49 | 440,157.38 | 515,716.87 |
| Step 4—subtract reserve balance at end of prior year | | |
| 1963: 307,157.48 | | |
| 1964: 323,169.86 | 132,999.90 | 192,547.01 |

For 1964 taxpayer claimed an additional $45,390.98 deduction, justified only by this explanation on the return: "Loss reserve of subsidiary transferred to parent upon dissolution of subsidiary disallowed upon Agent's examination of subsidiary. Deduction this year to restore reserve to proper percentage." Thus the total bad debt deduction for 1964 was $237,937.99 ($192,547.01 plus $45,390.98).

The Commissioner followed the *Black Motor* formula, and computed a percentage for step one of 1.965 in 1963[2] and 1.801 in 1964. Also, the Commissioner in step two reduced the taxpayer's outstanding retail receivables by the unearned discount amount of $1,545,955 in 1963 and $1,657,666 in 1964. As a result, the Commissioner limited the taxpayer's deduction in 1963 to $33,487.41 and in 1964 to $164,809.66, summarized as follows:

| | 1963 | 1964 |
|---|---|---|
| Step 1—percentage | 1.965 | 1.801 |
| Step 2—times receivables | | |
| 1963: 11,380,838 | | |
| 1964: 12,282,348 | 223,657.37 | 221,250.54 |
| Step 3—add charges | | |
| 1963: 116,987.52 | | |
| 1964: 167,216.49 | 340,644.89 | 388,467.03 |
| Step 4—subtract reserve balance at end of prior year | | |
| 1963: 307,157.48 | | |
| 1964: 223,657.37 | 33,487.41 | 164,809.66 |

The Commissioner disallowed the difference between his computation of the deductions and that claimed by the taxpayer.[3]

The questions which must be answered herein concern (1) whether use of a fixed percentage each year of 2.5 against outstanding receivables is proper; (2) whether receivables should be reduced by the amount of unearned discount; (3) whether the reserve computed on the basis of outstanding retail receivables is adequate to cover wholesale receivables; and (4) whether the taxpayer's deduction of $45,390.98 in 1964, beyond that allowed by the formula, is permissible.

I.

The central question is the initial one about the proper percentage of receivables. In approving the 2.5 per cent used by taxpayer, the District Judge pointed out that management each year considered a variety of factors to arrive at a figure larger than one permitted by the *Black Motor* formula, such as taxpayer's widely fluctuating experience from year to year, changing economic conditions and variations in competition, an expanding volume of business, and industry-wide composite figures. The figure of 2.5 per cent is a minimum percentage reserve expected by the banks lending money to Atlantic. Finally, the District Judge observed that "[p]laintiff's management felt that it was absolutely necessary that it maintain a constant reserve"; as a result, Atlantic used the same 2.5 per cent for each year since 1955.

In assessing taxpayer's evidence, we are reminded by prior decisions of this Court that the statute permits only such additions to the bad debts reserve as are allowed "in the discretion of the Secretary or his delegate," the Commissioner of Internal Revenue Service. This Court on two occasions emphasized the "heavy burden" which taxpayer must carry to overcome that discretion. Pat-

2. The Internal Revenue Service agent who performed the audit said he compared a fifteen-year average and found the percentage to be within .01 per cent of the six-year average.

3. On March 9, 1967, the taxpayer paid a tax deficiency, together with interest, of $91,826.22.

terson v. Pizitz, Inc., 5 Cir., 1965, 353 F.2d 267, 270, cert. denied, 383 U.S. 910, 86 S.Ct. 895, 15 L.Ed.2d 666; Maverick-Clarke Litho Co. v. Com., 5 Cir., 1950, 180 F.2d 587, 592. In *Patterson* taxpayer tried to justify a reserve larger than warranted by past experience by testimony about increased delinquencies, depressed economic conditions, automation, strikes, and a liberalized credit policy. A jury verdict below sustained a higher reserve than that allowed by the Commissioner, but this Court nevertheless reversed by finding that "the evidence on balance . . . does not rise to that level of proof which would show an abuse of discretion on the part of the Commissioner." The circumstantial evidence fell short of establishing that the Commissioner acted arbitrarily.

The same conclusion applies to taxpayer's evidence in this case. By using an average of several years' experience to arrive at a percentage, the Commissioner takes account of the fluctuating losses. The testimony of changing economic conditions is too speculative a factor in this case to support a higher percentage. As business volume increases, so will the reserve, since step two of the *Black Motor* formula applies the percentage against outstanding receivables. Industry-wide composite figures are less relevant for a company like Atlantic with an extensive financial history than they are for a company in business too brief a time to develop actual bad debt experience. *See* Norfolk Industrial Loan Association v. United States, E.D.Va.1970, 70–2 U.S.T.C. ¶ 9527. National averages do not reflect local competitive situations, nor will they reflect taxpayer's special knowledge and business acumen which may result in its loss ratio being lower than the average business.[4] *See* James A. Messer Co., 57 T.C. 848 (1972). Nor can the percentage of reserve the banks expect Atlantic to maintain control our decision, since the banks are likely to add a cushion for security purposes which is inappropriate for tax purposes. *See* American State Bank v. United States, 7 Cir., 1960, 279 F.2d 585, 589–590, cert. denied, 364 U.S. 881, 81 S.Ct. 170, 5 L.Ed.2d 103; S. W. Coe & Co. v. Dallman, 7 Cir., 1954, 216 F.2d 566, 569–570; Massachusetts Business Development Corp. v. Comm'r, 52 T.C. 946, 952 (1969). A fixed percentage for use year after year in a business like this one is not reasonable in view of taxpayer's own testimony that competition and economic conditions have varied substantially. We, therefore, conclude that the taxpayer did not carry its heavy burden of showing that the Commissioner abused his discretion in basing the percentage of receivables on past experience in the circumstances of this case.

II.

Taxpayer also applied the fixed percentage against gross outstanding retail receivables to establish bad debts reserve, while the Commissioner applied the percentage against the gross receivables less unearned discount. The Dis-

4. One statement of "Finance Industry Composite Figures" was prepared by the Chase Manhattan Bank. The introduction to the statement contained these limitations:

"First, while all the small loan and sales finance companies are included in the largest category of each tabulation, the results for the other categories include only Chase accounts and thus may not be typical of the industry as a whole. Second, the ratios and percentages are based upon our own method of analysis which sometimes varies from methods used by others. Third, the composition of our categories varies as new accounts are taken on and some companies grow into the next larger size group. Fourth, complete data is not available to us in all categories but where the information we have is insufficient for a meaningful ratio the space has been left blank. Finally, unweighted averages are used. However, median figures have been substituted when they appear to more accurately reflect the actual situation. Thus, the judgment of our finance company specialist is involved to a degree in the final results."

trict Judge properly upheld the Commissioner on this question, because taxpayer can only maintain a reserve against receivables in which taxpayer has a tax basis. Taxpayer has a tax basis for the amount of money loaned, not for the face amount of a note. As interest or discount income accrues, the tax basis increases by the amount taken into income. Taxpayer has no tax basis in the unearned discount. *See* Voliva v. Comm'r, 7 Cir., 1929, 36 F.2d 212; Central Bank Co., 23 T.C.M. 1565, 1572, 1580 (1964); 5 Mertens § 30.69, p. 143.

### III.

On appeal the Government insists that taxpayer is "not entitled to maintain a bad debt reserve against its wholesale receivables," because these loans are secured by trust receipts, there is no evidence that the taxpayer ever experienced losses from these transactions, and any future losses would be so rare and unpredictable that they do not qualify for the reserve method provided in section 166(c). As authority, the Government cites James A. Messer Co., 57 T.C. 848 (1972) and Rev.Rul. 68–3, 1968–1 C.B. 75.

■ Both authorities are inapposite to this case. In *Messer* the debt was a nonrecurring type owed by a corporation wholly owned by the taxpayer, so the special nature of the debt led the Court to conclude a reserve was inappropriate. Revenue Ruling 68–3 concerns deposits by one bank in another bank. The ruling states that any losses would be "rare and unpredictable"; additionally, the ruling emphasized that the loans did not arise in the "normal course" of the depositing bank's business. The common fact in both cases is the unique nature of the loan when compared to taxpayer's

business. By comparison, in the present case Atlantic's wholesale loans are an integral part of the business, as indicated by the volume of wholesale loans in 1963 and 1964 being larger than the volume of retail loans. The risk of loss from wholesale loans, especially when secured by trust receipts, is perhaps minimal, but the loans still involve a greater risk than deposits of money in another bank.

The prior history of no losses suggests that a large reserve is probably unnecessary, but this history should not prevent the allowance of some reserve if there is sufficient evidence to justify it. *See* First Trust and Savings Bank of Davenport v. United States, S.D.Iowa, 1969, 301 F.Supp. 194, 198;[5] Rev.Rul. 69–548, 1969–2 C.B. 32. The amount of addition for the wholesale receivables should be computed separately from the addition for retail receivables because of the differing loss experience. We remand for a redetermination (and the taking of further evidence if need be) of what a reasonable addition to reserve should be for wholesale receivables.

### IV.

In its 1964 return, the taxpayer claimed a total of $237,937.99 bad debt deduction, composed not only of an addition to the reserve of $192,547 based on applying 2.5 per cent against gross outstanding retail receivables, but also a deduction of $45,390.98 for the "[l]oss reserve of subsidiary transferred to parent upon dissolution of subsidiary." The District Judge said the statutory notice did not disclose that the Commissioner disallowed any part of the $45,390.98 additional bad debt deduction, yet the Commissioner's notice reveals a clear intent to disallow the entire $45,390.98 deduction. After recomputing the allowable

5. The Court in *First Trust and Saving* distinguished low-risk loans from government-insured loans where there is no risk of loss. Then the Court concluded: "The fact that there have been in the past no losses in respect to these loans does not justify the conclusion that there is no reasonable risk of loss, or that such losses may not be reasonably anticipated to occur in the future in the ordinary course of the taxpayer's business." 301 F.Supp. at 198.

deduction to be $164,809.66 by use of the *Black Motor* formula, the Commissioner made the following calculation:

| Bad debt deduction per return | $237,937.99 |
|---|---|
| Bad debt deduction corrected | 164,809.66 |
| Bad debt disallowed | $ 73,128.33 |

If the Commissioner intended to allow the $45,390.98 deduction, he would have subtracted $164,809.66 from $192,547.01 instead of subtracting from the total bad debt deduction of $237,937.99.

When Atlantic liquidated the subsidiary in 1962, Atlantic acquired the subsidiary's outstanding receivables. The Internal Revenue Service required the subsidiary to take into income the balance in its bad debt reserve, namely, the sum of $45,390.98. *See* O'Hare, Statutory Nonrecognition of Income and the Overriding Principle of the Tax Benefit Rule in the Taxation of Corporations and Shareholders, 27 Tax L.Rev. 215, 234 (1972) (discussing the propriety of such I.R.S. action). Because Atlantic inherited the receivables, the company argues that it should also inhereit a deduction. equal to the amount taken into income by the subsidiary.

If the subsidiary's receivables were combined with the parent's outstanding receivables after the liquidation in 1962, the subsidiary's receivables thus generated an addition to the parent's reserve in that it should also inherit a deduction against the parent's own outstanding receivables as well as against the inherited receivables. To deduct $45,390.98 [6] more would permit a double deduction for the inherited receivables from the subsidiary. We have carefully examined the record on this point, but it is not clear what actually occurred, despite the District Court's holding, without further discussion, that taxpayer had borne its burden of proving its right to this additional deduction.

6. In view of what was said earlier in this opinion with regard to taxpayer's method of computing a reserve, we believe the

Accordingly, since a remand is necessary, we also remand on this issue for the taking of additional evidence, if necessary, and a resolution of the question.

Reversed and remanded.

sum of $45,390.98 may be an incorrect amount even if some deduction is allowed.